Herman Franck, Esq. (SB# 123476)
Law Offices of Herman Franck
926 J Street, Suite 914
Sacramento, CA 95814
(916) 447-8400
(916) 447-0720 (fax)

Attorney for Plaintiffs
Todd Ashker &
Danny Troxell

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| TODD ASHKER, DANNY TROXELL, | Case No. |
| Plaintiffs, | CIVIL RIGHTS COMPLAINT FOR DAMAGES, INJUNCTIVE, AND DECLATORY RELIEF |
| vs. | [42 U.S.C. SECTION 1983] |
| ARNOLD SCHWARZENEGGER; R.Q. HICKMAN; EDWARD ALAMEDIA JR.; JEANNE WOODFORD; JOE MCGRATH; CAROL A. DALY; SHARON LAWIN; CAL TERHUNE, GEORGE LEHMAN; MR. ROOS; BOOKER T. WELCH; BRETT GRANLUND; LARRY STARN; KENNETH L. RISEN; JONES M. MOORE; GRAY DAVIS; PETE WILSON; JAMES GOMEZ, AND DOES 1-10, | (WITH SUPPLEMENTAL STATE LAW CLAIMS)  JURY TRIAL DEMANDED |
| Defendants, | |
| _____/ | |

Plaintiffs Todd Ashker and Danny Troxell, and each of them, herewith submit this Civil Rights

Complaint for Damages, Injunctive, and Declatory Relief with Supplemental State-Law Claims.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)         1

# I.
## PRELIMINARY STATEMENT

This is a 42 U.S.C. Section 1983 civil rights action filed by Todd Ashker, and Danny Troxell,

who are state prisoners, confined by the California Department of Corrections (hereafter referred

to as CDC.), at Pelican Bay State Prison's Security Housing Unit (hereafter referred to as

P.B.S.P.-S.H.U.).  Plaintiffs seek Damages, Injunctive and Declatory Relief, alleging defendants

have violated their rights under the First, Fifth, Eighth and Fourteenth Amendments to the United

States Constitution, and related state law claims, based on the following:


Ashker is serving a prison term of '21 years-to-life' subsequent to his conviction for second-

degree murder in 1990.  This was an in-prison incident.  Ashker was initially sentenced to a 6-

year term for burglary back in 1984.


On, or about late 1987, Folsom State Prison Gang Unit Staff labeled him as an 'associate' of the

Aryan Brotherhood Prison Gang, based on information from inmate informants.  Ashker has

always denied this, and has steadfastedly denied being involved in any illegal activity.  Ashker

has been continuously housed in various SHU units since August 1986.  He was transferred to

PBSP-SHU on May 2, 1990, where he has been confined ever since, other than a few, brief trips

to Folsom and San Quentin Prisons, for court and medical care reasons.


CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          2

Since 1992, the CDC administration has kept him confined in the SHU on "Indeterminate" status solely based on the gang association label they placed on him in 1987.

Troxell is serving a prison term of '26 years-to-life' subsequent to his first-degree murder guilty plea in 1979.

In January of 1984, Folsom Prison Administrators issued a crono stating that he was an 'associate' of the Aryan Brotherhood Prison Gang.  Troxell was programming (working in the kitchen at Folsom), until October 1985, at which time administrative staff ordered his placement in SHU based solely upon inmate informant claims that he was involved in Aryan Brotherhood activity.

Troxell has remained in various SHU units ever since 1985; and he was one of the first prisoners transferred to PBSP-SHU when it opened in December 1989.  Where he has been continuously housed on 'Indeterminate" status, solely based on the gang label.  A label he has always denied, (in so far as any involvement in 'illegal' activity).

The entire time plaintiffs have been housed in SHU on 'Indeterminate' status, defendants Terhune, Gomez, Hickman, Alameida, Woodford, and McGrath have subjected them to the ongoing and progressively more restrictive punitive conditions therein.  Defendants have tried to compel plaintiffs to become CDC informants by instituting a policy and telling plaintiffs that

their only way out of SHU is if they parole, die, or 'debrief, which means implicating

themselves, other inmates, and if possible, CDC staff in gang activity.  The above named

defendants additionally have a long standing policy and/or practice of treating white prisoners

housed in PBSP-SHU differently than all other groups; this includes plaintiffs as described

above.


Defendants Wilson, Davis, Schwarzenegger, Hickman, Alamedia, Woodford, McGrath, via

various policies, procedures, and practices, have all failed to provide program opportunities to

SHU prisoners, including plaintiffs, which are requirements by the State Parole Board in order to

have any real chance at a parole date.  This in turn has also affected public safety in general,

because SHU prisoners are denied programs that would help them become productive citizens.

Such denial(s) of access and opportunity to such programs/rehabilitation services have been in

violation of state law and regulations, as well as constitutional law.


Defendants Wilson and Davis both stacked the State Parole Board with members who have the

same political, and/or personal views as theirs, regarding parole of lifers.  Some of these board

members being: defendants Carol A. Daly, Sharon Lawin, Lehman, Roos, Welch, Granlund,

Starn, Risen, and Moore.  These defendants not only do not abide by the legislative intent of the

law and statutes, but they also operate under a blanket "no-parole policy" for prisoners on

'Indeterminate SHU status' stating they "need to get out of SHU, and participate in various

programs."  Defendants have established a policy that creates only one way to get out of SHU,

which is to "debrief."  This policy requires plaintiffs to become CDC informants, which in turn,

jeopardizes their lives and the lives of family and friends outside of prison.  Unless plaintiffs

debrief, they will never receive meaningful parole consideration.

Plaintiffs are not seeking a release from prison, nor are they challenging any of the Parole

Board's 'discretionary functions' via this action.  Instead, they are seeking to enjoin and receive

damages for illegal policy decisions that keep non-debriefing inmates in SHU on an

indeterminate status, and a policy that such SHU inmates will never be paroled.

## II.
## JURISDICTION & VENUE

1. The U.S. District Court has jurisdiction over this 42 U.S.C. Section 1983 action alleging

violations of their federal constitutional rights under 42 U.S.C. Section 1331, and 1343.  The

court has supplemental jurisdiction over their state law claims under 28 U.S.C. Section 1367.

2. Venue is proper under 28 U.S.C. 1391(b)(2), because a substantial portion of the events giving

rise to the claims alleged in this complaint arose within the Northern District of California, in the

County of Del Norte.

**III.**
**PARTIES**

3. Plaintiffs' Todd Ashker and Danny Troxell are both serving life terms, who have been confined to Pelican Bay State Prison's Security Housing Unit, during the events described in this complaint.

4. (a) The defendants are state officials responsible for the policies, practice and procedures by which California operates both prison classification, and rehabilitation program opportunities, as well as parole proceedings.  Defendant Arnold Schwarzenegger is Governor of the State of California and Chief Executive of The State Government.  Defendants' Pete Wilson and Gray Davis are each former holders of the Governor's office.  Defendant Roderick Q. Hickman is the Secretary of the California Youth Adult Correctional Agency.  Defendant Jeanne Woodford is director of the California Department of Corrections.  Defendants James Gomez, Cal Terhune, and Edward S. Alamedia, Jr. are former Directors of Corrections.  Joe McGrath is the Warden of Pelican Bay State Prison.  Defendant Carol A. Daly is a Commissioner and Chair of the Board of Prison Terms (BTP).  Defendants Sharon Lawin, George Lehman, Roos, Booker T. Welch, Bret Granlund, Larry Starn, Kenneth L. Risen, and Jones M. Moore are believed to be Commissioners of the BPT.  Defendants Doe's are currently unknown by name.

4. (b) Each and all of the above defendants are being sued in their personal and individual capacities for <u>damages</u>, and in their official capacities for <u>Injunctive Relief Purposes</u>.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)        6

5. Each and all of the defendants have acted, and for those still in office, continue to act, under the color of Authority and State Law at all times relevant to this complaint.

## IV.
## FACTS

### A.
### - PLAINTIFF ASHKER -

6. Ashker has been in state prison since January 1985, following a plea of guilty to first-degree burglary, for which he received a six-year term.

7. He has been housed in various SHU units on a continuous basis, beginning in August 1986. Originally, his SHU placement was for prison 'disciplinary' reasons.

8. On May 25, 1987, while housed in the SHU at new Folsom State Prison, he was charged (by prison staff) with the murder of inmate Dennis Murphy.  Murphy was an A.B. member.

9. Trial commenced in early 1990.  The CDC and prosecutor's theory being that the murder was a premeditated gang-hit, yet Ashker was the sole person charged and tried.

10. Ashker's position was that Murphy's death was not intentional, and came about while he was defending himself from Murphy.

11. The jury rejected the D.A.'s first degree, gang-hit theory, and convicted Ashker of second-degree murder.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          7

12. In April 1990, the court sentenced him to a term of 21 years-to-life.

13. New Folsom Prison had Ashker transferred to Pelican Bay State Prison's SHU unit on May 2, 1990, which is where he has been incarcerated ever since (other than a few, temporary transfers to Folsom or San Quentin Prisons for medical care and court proceedings).

14. Prior to the death or Murphy in May of 1987, CDC did not have Ashker labeled with any gang associations.  And in mid-May 1987, the committee at new Folsom Prison actually approved him for placement in the 'general population' that coming July of 1987, so long as he remained disciplinary free during that time period.

15. Murphy's death occurred on May 25, 1987, and it was shortly after that when Folsom Staff housed him in a unit known as 'Bed Rock' (or, violence control unit), where most of the white prisoners were labeled as A.B. members/associates.  It was within the first 90 days of being placed in there that CDC labeled him as an A.B. associate, based on inmate informant's claims.

16. The prosecutor based his entire premeditated A.B. Gang-hit theory in the Murphy case on CDC gang investigators info, which was based solely on inmate informants seeking and receiving favors.  Yet, at the trial, the prosecutor chose not to use any of these informants, stating on the record:

> "Now, the testimony of an informant in court is suspect.  I for, example, chose not to use  any of this at trial."

These are the same informants CDC used to originally label Ashker in the first place (based on information and belief.)  This is the only criminal act that CDC ever actually charged as being directly tied into 'illegal gang activity.'  The prosecution based their case on CDC's gang-hit theory, a theory the jury rejected.

17. At some point around 1992, the PBSP classification committee placed him on indeterminate SHU status, based on the gang-association label.  But it was back in 1990 when he arrived at PBSP-SHU, that staff told him his only way out of SHU would be to parole, die or debrief.  Debrief means to inform CDC staff about any gang activity, gang members, or other criminal conduct.

18. Ashker has always denied being an 'associate of the A.B. Gang."  By this he means that he is not a member, associate member, or any kind of member to the A.B. gang, and has not been privy to, nor involved in illegal gang activity.

19. He has been housed around, gone to the yard with, and been celled with other white prisoners who were either admitted members, or whom CDC also had labeled as gang associates based on informants' claims. While at PBSP-SHU, Ashker has been kept virtually isolated from all other white prisoners, other than his cell mate(s), and a few other exceptions.

20. CDC Staff have placed plaintiff with these white inmates since the Murphy incident (Folsom Prison, May 25, 1987).  During that period (1987 – present) Ashker has often helped these prisoners with legal matters (including gang-label charges) and formed some friendships.  That is the extent of this 'alleged' association.

21. Ashker has not been involved in "illegal gang-activity", and therefore has no information to provide CDC.  He is aware of what CDC informants generally say when they are trying to 'successfully debrief' based on the reports and transcripts he has reviewed over the years while helping others and dealing with his own case(s).  It would be a simple matter for him to be deemed a 'reliable informant' per CDC's criteria.  All he would have to do is 'make a weapon and give it to the staff saying "I was ordered by the gang to assault staff, but I want to debrief." Then Ashker could copy the statements that other inmates have made, listing names of the same prisoners, and detailing the same criminal conduct.  He could further make up a few new stories that he knows would aid CDC's agenda.  Presto, Ashker would be deemed a 'reliable source' by CDC officials, because he has (a) incriminated himself in illegal activity and (b) provided information proved true (e.g. a gang-hit-on-staff conspiracy, and presentation of a weapon), (c) provided information that is corroborated by other informants (list of names and other conspiracies), and it would have all been a gigantic lie, which shows how weak the debriefing system is.

22. Ashker refuses to tell such a lie.  He has repeatedly challenged CDC's gang-label on him via each level of the CDC Rule 602 administrative grievance and appeal process.  Ashker started this process back in 1992, wherein he denied any and all parts of the gang label, and stated his desire to program on 'general population.'  All of these 602's were denied at each level of review.

23. CDC also publishes in the media its finding about gang status.  Ashker is a well known Prison Conditions Litigator, having prevailed on several cases.  In 1993, he did an interview for 60 Minutes  (under premise of the show's interest in his suit stemming from being shot by PBSP Staff in 1990, and terrible follow-up care, which was severely edited with no mention of any of this), in which the voice over begins, "Meet Todd Ashker, who CDC alleges is a member of the Aryan Brotherhood."  In November of 2002, a PBSP gang unit Sgt. and two informants were on the Channel 2 News talking about 'A.B. conspiracies.'  This Sgt. showed on air several photos of alleged A.B. members, including photos of Ashker and Troxell.  Such TV segments were viewed by the general public, and by thousands of prisoners, thus facilitating other inmates' efforts interested in, and/or going through debriefing.  The on air information tells inmates what CDC is looking for (e.g. any adverse information on any of the shown inmates.)

24. Between 1985 and 1987, the CDC did not provide prisoners with any notice at all that an 'association' with a prison gang would be cause for permanent, 'indeterminate SHU' status until the prisoner successfully 'debriefed.'

25. 'Debriefing' means becoming a CDC informant, which requires the debriefing prisoner to tell on himself, other inmates, and CDC staff members, as well as some kind of 'new' information about gang-related and/or criminal activity(s) that CDC staff were not aware of, or rather, heard rumors about, and want corroborating details about, and which they obtain via manipulative interrogation sessions.

26. At no time have any CDC staff informed plaintiff that a 'gang-associate' label, resulting in 'indeterminate SHU' status, would be cause for his '21 year-to-life' prison sentence to be changed to a 'life-without-parole' sentence.  However, the reality is the State Parole Board operates with a 'no-parole' policy for prisoners held in SHU on 'indeterminate status.

27. It was not until sometime between 1995 and 1998 that CDC 'formally' adopted any rules or regulations, specifically dealing with their practice of keeping prisoners with 'gang-association' labels in SHU on 'indeterminate' status.

28.  It was not until sometime in 1999, or so, that defendant Alameida formally promulgated any specific rule, regulations, and guidelines for CDC staff to follow with regards to the 'debriefing' process.  (15 CCR 3378.1 et seq).

29. In 2000, or so, defendant Alameida formally promulgated a new, alternative means for a prisoner on 'indeterminate SHU' status to gain release from SHU.  This is referred to as 'inactive' gang status.  (15 CCR 3378(e))

30. 'Inactive gang status: is defined as, "The inmate has not been identified as having been involved in gang activity for a minimum of six years."

31. A single, so-called 'reliable source' claiming that a prisoner is involved in gang activity is sufficient cause for CDC staff to deem said prisoner 'active'; at which point the six year term period starts all over.  CDC equates 'gang-activity' with one source stating the prisoner being reviewed is, "a member, or associate of a gang."

32. Defendants Alameida, Woodford and McGrath know that this 'inactive status' avenue for a prisoner to get released from SHU is a sham that was enacted to make it appear that there was an 'alternative means' for a prisoner to get out of SHU other than becoming a CDC informant, as demonstrated by the following.

33. Even if a prison was to meet the standards for 'inactive status,' CDC can still keep him in SHU.  The Departmental Review Board (DRB) is authorized to retain an inactive gang-member or associate in SHU based on the inmates' "past or present level of influence in the gang, history of misconduct, history of criminal activity, or other factors indicating that the inmate poses a threat to other inmates or to institutional security."  (15 CCR 3341.5(c)(5)).

34.  What it boils down to is this.  If CDC staff wants to let a prisoner on 'indeterminate' status out of SHU, they do so by simply claiming he meets 'inactive' status, regardless of whether he actually does meet the criteria or not.

35. Plaintiff personally does not know of a single white prisoner housed in PBSP's SHU unit (for the past 6-14 years, labeled as an Aryan Brotherhood member or associate), to be deemed on 'inactive' status; except one, and he was never released to one of CDC's general populations because CDC staff claimed that they had no place to put him.  Notably – defendants keep whites more isolated from each other than all other races as an extra punitive measure to coerce them into debriefing.  This is even more suspect because they are more isolated from each other than any other group.)  So how is it possible that all of the ones who have been broken down, and decided to debrief, would have reliable, new information about alleged gang activity unless staff was providing them with information and/or their stories were based on rumors, innuendos, hearsay, and out-right lies.  Because the conditions in PBSP-SHU are so punitive in nature (and even more so for whites who are already a minority race there, and who defendants intentionally keep even more isolated from being able to socially interact with each other, than all other groups), many inmates can't take it, and will say or do anything to get out of SHU.  As a result, all sorts of lies are told by inmates with the primary motivation of getting out of PBSP. Defendants are fully aware of the desperate motivations of these inmates, and yet still consider all that is told by them as the gospel.  (Based on information and belief).

36. Ashker's last (CDC 115) rules violations consisted of a 1990 assault on a prisoner; a pair of 1992 assaults on staff; a 1994 possession of contraband (not drugs); and a 1995 'talking in the law library.'

37.  The 1990 charge was about a fist-fight orchestrated by staff, during which Ashker was shot by staff and permanently disabled, which became the subject of a successful wrongful shooting and medical malpractice claim.  The pair of 1992 'staff assaults' occurred on the same day, on the same guard on a transport bus.  The first time Ashker was fully shackled, hands and feet, when a guard attacked him.  The second time was later on after numerous guards surrounded him while the same guard removed his shackle.  None of theses incidents were in any way gang related.

38.  By July of 2001, Ashker had over 6 years of 'disciplinary clean' time in.  Ashker asked his unit counselor to put him up for a review regarding eligibility for 'inactive' status (while maintaining he was not a member of any gang).

39.  On August 24, 2001, Ashker received a CDC-128B crono, which listed four items of 'confidential information' indicating that he was still an active gang-member, and informing him that he can renew his 'inactive review' request after June 18, 2007.

40. On September 3, 2001, Ashker submitted a detailed 602 appeal challenging CDC's position(s) regarding their confidentiality claims, as well as specifically addressing and refuting each of the four claims, which was substantially hindered because no specific details were provided to him.

41. On October of 2001, Ashker received defendant McGrath's generic, generalized response denying all aspects of the appeal.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)           15

42. Ashker then sent the appeal on to defendant Alameida for Director Level and final review. He received it back in 2002, denied in full, thus exhausting a second time all available administrative remedies.

43. Defendants' Gomez, Terhune, Alameida, Woodford, McGrath, and Does have known for many years that prisoners subjected to their progressively restrictive, punitive SHU conditions (together with their position that prisoners subject to 'indeterminate' status), only real means for being let out of SHU is for them to parole, die or debrief has been cause for literally hundreds of inmates to come forward and 'debrief', and defendants know that such inmates stories are often bald faced lies, or based on rumor, innuendo, and/or the same old 'conspiracy' theories from 30 or more years ago.

44. These same five defendants are also each fully aware of the fact that a vast majority of all of their 'reliable' source(s) have no personal knowledge about what other prisoners are involved in, because PBSP-SHU, by its very construction and purpose, is meant to isolate people.  They are fully aware of the Los Angeles County scandal of the 1990's regarding jail house informants (one of which gave a demonstration of how easy it was to make it appear his information was the result of people confessing their crimes to him).  Defendants know such confession practices are more prevalent within CDC and especially in PBSP.  Plaintiffs have been even more isolated than most other PBSP-SHU prisoners, in so far as being isolated from their social group (other whites.)

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          16

45.  Theses same defendants know that there are so many inmates who are desperate to get out of PBSP-SHU, that there is a backlog of hundreds of them who are currently going through the various stages of the debriefing process, (while many are on the waiting list to do so).  (Based on information and belief).

46. Defendants Alameida, Woodford and McGrath have intentionally sought to make the conditions in PBSP-SHU progressively more punitive, not for legitimate penological reasons, but rather to coerce more informants into 'debriefing' (out of a sense of desperation and hopelessness), as well as increasing the amounts of fabricated information CDC staff receive by mandating that inmates must provide 'new' information, in order to 'successfully debrief.'

47. Alameida, Woodford, McGrath, and Doe(s) are each fully aware of what a complete fraud their rules and regulations are with regard to certain SHU inmates, and their ability to ever be able to meet the criteria to be released from SHU on 'inactive' status.  This includes Ashker. (Based on information and belief).

48. Thus, Ashker's only way out of SHU will be to parole, die or via 'debriefing.'  The parole board requires him to get out of SHU and complete various programs prior to any chance of getting a parole date.  The CDC, and defendants herein, do not allow a SHU inmate to participate in any programs.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          17

49. The defendants' gang-label and subsequent placement of Ashker on SHU 'indeterminate' status for approximately ten years now has substantially prejudiced his chance of ever being paroled, and has thus violated his due substantive and procedural due process rights under the 5th and 14th Amendment to the U.S. Constitution.  He has suffered irreparable injury because during the past ten years, defendants have not provided program opportunities, ten years that are now gone forever. These are all cases of program opportunities denied without penological justification, mainly for refusing to debrief.

50. While he has repeatedly challenged the gang label, and 'inactive' member label(s), his ability to do so has been futile because defendants' won't disclose any specific details about their sources, or their claims, which is necessary to be able to adequately refute it.

51.  In 1998 and 2001, Ashker had his parole documentation hearings at which time he was notified by defendant Roos that getting out of SHU and upgrading his education, vocation, work-related and self-help was needed.

52. Defendants' Daly, Lawin, Lehman, Roos, Risen and Moore all know that the above would require Ashker's agreement to be a CDC informant.  Every aspect of their parole hearings for PBSP-SHU prisoners is a sham, because they have a blanket 'no-parole policy' (Based on information and belief).

53. On August 7, 2003, defendants' Lawin and Lehman held his initial eligibility hearing, at which time they denied him parole based on his SHU status, failure to program, and CDC's gang label.  (These were the core reasons).

54. Lawin then set his next hearing for 2008, and in so many words, stated he needed to do the same things Roos suggested in 2001.

55. Defendants Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, and Moore are members of the State Parole Board, who all ignore the law(s) and statutes concerning the issuance of parole dates.  In addition, they have implemented and enforced the 'No-parole' policy for prisoners kept on 'Indeterminate SHU' status created by defendants McGrath, Alameida and Woodford.

56. Defendants named above have thereby illegally changed Ashker's sentence to 'life without any possibility of parole' unless he agrees to become an informant for CDC.

57. On October 5, 2003, Ashker submitted a third round of the CDC Rule 602 appeals, challenging CDC policies and practices of subjecting him to the punitive restrictions in SHU (solely for 'administrative reasons' since 1992, rather than behavior) which has effectively denied him the opportunity(s) to participate in the programs required by the Parole Board, all of which results in a life-without-parole sentence.

58. In his administrative appeal, Ashker requested defendants McGrath, and Alameida to implement all or at least some of the programs/privileges as general population inmates have subject to legitimate/reasonable restrictions.

59. The first level of review resulted in a denial of the appeal with the CDC stating it was in compliance with state law.

60. Both PBSP and CDC director level staff refused to process the appeal for a response from McGrath or Alameida; and thus did not permit the normal channels of a second level (Warden McGrath) or third level (Director Alameida) review.

61. On October 28, 2003, Ashker submitted an administrative appeal to the Parole Board challenging their 'no-parole' policy, and all other aspects of the denial of parole decision.

62. On January 13, 2004, defendants Risen and Moore denied each claim raised in his appeal. Plaintiff Ashker has thus exhausted all available CDC administrative remedies.

63. Defendants Risen and Moore did not deny his factual claim(s) that the board has a 'no-parole' policy/practice for prisoners subject to SHU 'indeterminate' status based solely on 'administrative' reasons, and that the board expects a prisoner to become a CDC informant so he can get to programs on the general population prior to ever having even a slight change of ever getting a parole date.

**B.**
**- PLAINTIFF TROXELL –**

64. Troxell has been in state prison since July of 1979, after a plea of guilty to First Degree Murder, for which he received a term of 26 years-to-life.

65. The circumstances of the case were, in summary (based on eye-witness testimony at the preliminary hearing): Troxell entered a store armed with a single-shot shotgun with the intent of robbery.  A store manager ran up to Troxell, and grabbed the barrel of the gun, which caused Troxell's reflex response of pulling back, and to accidentally fire the gun, killing the store manager.

66. Troxell acknowledged his wrongdoing, and agreed to and did plead guilty.  Troxell did this after reading the First Degree Murder statute with his attorney, and which both understood to mean, that so long as he did not lose any 'good time' credits in prison, he would be entitled to a release date after serving 17 years, 8 months.

67. Upon his arrival in state prison, he wound up in SHU at San Quentin for allegedly being involved in some serious rule violations, the last one of which occurred in 1980.  'Serious' meaning causing serious injury to another.

68. He was assessed a SHU term for such violations (but did not lose any good time); and upon completion of his SHU term, he was transferred to Folsom State Prison's 'General Population' in January of 1984.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          21

69. When the committee at Folsom let him out to general population in 1984, they also issued a crono, stating he was an 'associate of the Aryan Brotherhood' Prison Gang, and that the 'association' label was based on confidential information (which Troxell believed came from an inmate informant at San Quentin, whom he never even had any personal interactions with). Troxell has not been given details of whatever this information was.

70. Troxell has always denied any and all of CDC's gang labels.  From the time he entered prison in July of 1979 on up to January 1984, he was never told by anyone that being labeled as an 'associate' and/or member of a prison gang would be cause for prison administrators to place him in 'indeterminate' SHU status, until he agreed to become a CDC informant, solely based on inmate informants saying he was A.B. (Troxell's position on the association issue(s) is akin to Ashker's at paragraphs 15 to 23.)

71. Troxell was never notified that CDC's gang labeling would be cause for the State Parole Board to change his sentence to 'life without any possibility of parole' until he agrees to become a CDC informant.

72. Between January 1975 and January 1984, Troxell knew of people who had life sentences, and who allegedly were gang members, who were granted parole dates.

73. When he was released to general population at Folsom in January 1984, he was programming well, and even received 'positive work' reports from his job in the kitchen.

74. He was able to maintain a good relationship with his fiancée and daughter via regular contact visits; he was only confined to his cell for an average of 10 hours a day.  The rest of the time he was working, or enjoying his visits and yard time.

75. He had a color TV and radio in his cell; various items of personal clothing; access to a wide variety of store items from the canteen seven days a week; four thirty-pound packages of food, clothes, tobacco products, etc. per year; and social interactions with numerous people throughout each day; phone calls and photos.

76. In October 1985, Folsom Prison Administrators ordered that Troxell be placed in SHU solely for administrative reasons.

77. Shortly thereafter, he was transferred to Chino State Prison's administrative segregation, and kept on 'strip cell' status for six months, without any property.  After which, he was then placed in the regular AD Seg. Unit there, and issued a small amount of his property.  His visits were behind glass, once a month.

78. He was kept in Chino until being transferred to the newly opened Tehachapi SHU unit around November 1986, at which time, the administrative committee told him he was to be placed on 'indeterminate' SHU status based on CDC's labeling him as a 'Member of the Aryan Brotherhood."

79. In December 1989, he was transferred to (and was one of the first prisoners housed in) PBSP-SHU, where he has been confined ever since.  During which time he has been kept virtually isolated from other white prisoners, with few exceptions (other than cell mates.)

80. In 1990, he submitted his first 602 appeal, challenging CDC policy and practice of keeping him continuously confined within [and subjected to the punitive conditions therein] the SHU on 'indeterminate' status, solely for administrative reasons.

81. CDC administrative personnel have denied his 602(s) at each of the three levels of review.

82. Troxell had his initial parole eligibility hearing back in September 1995, before a panel of defendant Pete Wilson's biased commissioners (by biased, plaintiff refers to Wilson's practice of only appointing people to the board who shared his political views about rarely granting parole, regardless of what the law and statutes say, based on information and belief).

83. At this time, the board noted Troxell had been free of any <u>serious</u> disciplinary violations since 1981, and that he had family support, were he to be released.

84. The board nevertheless denied a parole date, in large part based on CDC labeling him a gang member, stating he needed to get out of SHU (meaning becoming a CDC informant), upgrade his education and vocation skills, obtain a good work record, and participate in self-help programs. The board then scheduled his next hearing for the year 2000, five years away.

85. Yet, his next hearing was not held until nearly six years later, occurring in July of 2001.

86. At his second parole hearing, defendants Welch, Granlund and Starn denied a parole date again, for the same reasons as those of his first hearing.

87. Defendants named above had no intention of giving Troxell a parole date at his July 2001 hearing because they have a 'no-parole' policy for prisoner confined in SHU on 'indeterminate' status, based on CDC labeling a person an 'associate' of a prison gang (See additional details of this practice and policy in Paragraphs 50-56).

88. Defendants above named then set his next parole hearing for the year 2005, four years away, again stating he needed to get out of SHU, and participate in programs. (See Paragraph 85).

89. Back on December 14, 1999, the PBSP institutional classification committee (hereafter ICC), submitted his case to the gang unit in order to determine if he met the criteria for inactive status (See Paragraphs 29 to 35 above for details about this inactive status criteria, etc.)

90. On April 12, 2000, another ICC committee noted the following: "Committee reviewed subject for inactive gang status, and the date of the most recent gang activity as noted in the C-file could not be established.  On December 14, 1999, ICC referred this case to the in lieu via PBSP IGI for clarification of S's current prison gang validation status.  The in lieu review is pending."

91. On March 21, 2001, another ICC committee noted that "S was referred to IGI by ICC of December 14, 1999 for inactive gang status, but due to administrative oversight, he was not reviewed. Committee acts to re-submit the referral to IGI for inactive gang status review."

92. Supposedly, on that very same day, the in lieu reviewed his case, and on June 23, 2001, they issued a CDC-128B crono, stating he will be retained on active status in SHU, and his next eligible date for 'inactive' status will be after August 3, 2006.

93. The basis for lieu(s) determination that Troxell was still an 'active' gang member was based on confidential memos dates September 20, 1999 and August 3, 2000.

94. The September 20, 1999 confidential memo that stated Troxell is a "gang member," and defendant McGrath knows is not sufficient to demonstrate a prisoner is an 'active' participant, and the last confidential memo (from one of CDC's informants) stating he was a gang member was dated January 9, 1989.

95. As a matter of fact, not one of the five original confidential memos (these are dated May 2, 1988, July 26, 1988; August 5, 1988, August 10, 1988, January 9, 1989) used to justify keeping Troxell on 'indeterminate' SHU status make any claims that he was a participant in any actual illegal activity on behalf of the gang. All they state is that he was a member of the gang (based on information and belief).

96. Troxell should have been released from SHU back in early 2000 because there was nothing to indicate his active involvement in any gang activity.  PBSP administrative had no intention of ever releasing him from SHU, and instead acted like his case was being reviewed, and/or had slipped through the cracks, while IGI staff asked all of their debriefing inmates about Troxell's activities. (Based on information and belief)

97.  Then, conveniently, in mid 2000, one of their informant's claims Troxell is a 'member of the Aryan Brotherhood Counsel," which is then used to justify keeping him in SHU and subject to the 'no-parole' policy of the Parole Board.  His 602 challenging the 'inactive' status issue was not processed by PBSP staff in 2004, thus, their refusal to process his 602 constitutes an exhaustion of his administrative remedies.

98. On October 4, 2003, Troxell submitted a 602 appeal to challenge CDC policy and practice of keeping him on 'indeterminate' SHU status (subject to the punitive, destructive conditions therein for over 18 years) solely for 'administrative reasons' rather than behavior, which has denied him the change of ever getting a parole date because none of the basic programs are available in SHU that are required by the Parole Board, as well as the 'no-parole' policy.

99. He asked defendants McGrath, and Alameida to implement all of the programs/privileges available to general population inmates (subject to legitimate/reasonable restrictions) in part so he would have the opportunity(s) to participate in some programs required by the board.

100. The first level of review denied the appeal, claiming CDC was in compliance with state law.

101. Troxell submitted the 602 to the "Second Level" in order to get a reply from defendant, McGrath, but the appeals coordinator refused to process it.  He then sent it on to the Director's Level for a response from Alameida or Rimmer, but once again, Director Level staff refused to process it.

102. In October of 2003, Troxell submitted an administrative appeal to the Board of Prison Terms challenging their 'no-parole' policy, as well as all other issues relating to their previous decisions to deny him a parole date (as well as setting his next hearings 5 and 4 years away – which with 'good time' factored in equates to 7 ½ and 6 years worth of time in).

103. Defendants have not ever responded to his appeal sent to the Parole Board over 5 months ago, which is a denial of due process (see: _In re: Woodham_ (2002) 95 Cal. App.4[th] 438), and constitutes exhaustion of his administrative remedies.

104. Based on the actions of the defendants (and/or their failures to act) Troxell has been deprived of any and all hope of ever getting a parole date.  Despite his exemplary programming efforts and excellent work record, when he was in 'general population' at Folsom State Prison from January 1984 to October 1985.  The fact that the murder he pled guilty to in 1979 was an accident for which he has already served over 25 years for (which, with his 'good time' factored in equates to 37 ½ years in prison, on a 26 year-to-life sentence).

**V.**
**- ADDITIONAL GENERAL ALLEGATIONS -**

105. Defendants' actions, as described above, have taken away any and all hope(s) that plaintiffs ever had of being released on parole.  Instead, defendants have forced them into a 'Hobson's choice' of doing 'life-without-parole' in the SHU unless they agree to become CDC informants, which in turn, would be placing the lives of family, friends, and their own well being in serious jeopardy.  The debriefing requirement also improperly motivates inmates into making up stories just to get out of PBSP.

106. Defendants' policies and practice constitute an abuse of power, and willful intent to violate the statutory law (and legislative intent) of the parole statute of Penal Code 3041.  The purpose of Penal Code 3041 is to provide uniform terms for similar offenses, as well as mandating that parole shall normally be granted at the prisoner's initial eligibility hearing (subject to one of four enumerated exceptions, P. Code 3041(b)).  Plaintiffs have a due process right, a liberty right, in the right of parole.

107. The purpose and intent of California's "parole system" was for the rehabilitation of those offenders willing to participate.  So as to facilitate their release on parole at the earliest time permitted by law.

108. Defendants have chosen to intentionally violate California prisoners' rights and expectations of having a release date set, including plaintiffs', based on the above factors (based on information and belief); and also as demonstrated by the following.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          29

109. For the decade prior to Governor Wilson taking office in 1991, the parole rate for life prisoners averaged 3.5% (life prisoner reports, annual 1981-1990, Board of Prison Terms).

110. Since then, the rate has dropped steadily to only 0.26% in 1996, a 15:1 decrease (going from approximately 90 per year to 6)

111. Defendant Wilson started the 'no parole for all murders' trend, using his position as the Governor and as Chief Executive Officer to influence the Parole Board's decisions via political pressure, as well as filling Parole Board appointments with people who disfavored parole (based on information and belief).

112. Thus, Wilson is at least partially responsible for the Board's blanket 'no-parole' policy that Troxell was subject to at his hearing in 1995.

113. From the time Governor Davis campaigned for, and took office in 1999, he continued this trend, as demonstrated by the fact that from January of 1999 through April 2001, the Board held 4800 parole suitability hearings, and granted parole to 48 prisoners.  Of these 48 prisoners, Davis reversed 47 of the Board's decisions.  Governor Davis publicly stated his no parole policy and then verbally (but not actually) backed off that after he became subject to several inmate lawsuits.

114. Defendant Davis used his position of influence and power to influence the Parole Board Membership and decisions in a manner similar to that of Wilson. (Based on information and belief.)

115. Defendants Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore and Does are each Board Members appointed to their positions by Davis because they disfavor granting parole; their decisions are based on their personal, political views rather than making such decisions as neutrals, on a case by case basis, pursuant to statute. (Based on information and belief.)

116. Defendants above totally ignore the base terms for various kinds and degrees of murder, as suggested by the Legislature in the matrix, which is why over 7,000 prisoners who have served more than their mandatory minimums still sit in CDC prisons.  Defendants illegally apply Penal Code Section 3041(b) prior to 3041(a) when considering parole applications, in order to justify their decisions.

117. Defendants in paragraphs above are all at least partially responsible for the Board's blanket 'no-parole' policy that the plaintiffs were subject to at their hearings in July of 2001 (Troxell), and August of 2003 (Ashker).

118. In addition to challenging the policies, practices, and conditions via the available administrative appeals process as detailed above, plaintiffs have also sent letter(s) [on January 20, 2004 and February 6, 2004] and memorandums to defendants Governor Schwarzenegger, Hickman, McGrath and Daly, notifying them of their position that such policies, practices, and conditions are wrong and illegal, and they asked defendants to remedy such problems. Defendants thus are knowingly acting with deliberate indifference and conscious disregard to plaintiff's parole rights by failing to do anything to fix the problems described in this complaint is unconstitutional, and violate plaintiff's rights to due process of law (5th and 14th Amendments) violates the Ex Post Facto Clause of the United States Constitution (Art. I, Section 9), and constitutes cruel and unusual punishment in violation of the 8th Amendment to the United States Constitution.

119. Defendants' policies and practices regarding confining prisoners to the SHU on Indeterminate Status for administrative reasons, based on alleged gang membership/association.

120. Plaintiffs point out that at the time that they entered CDC, on up to the time the gang label based 'Indeterminate' terms in SHU were placed upon them, they were not notified of the consequences, of such determinations basically because such severe sanctions did not exist. No rules or regulations concerning SHU indeterminate, debriefing, and inactive status were ever formally promulgated into the CCR Title 15 until the time period between 1995 and 2000.

121. Defendants have long had the practice of affording SHU prisoners the opportunity to attend the institutional classification committee (ICC), an average of every 120 days, allegedly, in order to hear from the prisoner, and regularly review his status.  Such ICC hearings are a sham (just as the 'inactive' status is), because the criteria for release from SHU 'indeterminate' terms is via becoming a CDC informant, and "successfully debriefing." Period.

122. Defendants Davis, Schwarzenegger, Hickman, Alameida, Woodford, and Does have each been responsible for approving and/or implementing severe budget cuts for a majority of all prisoner programs and services necessary for prisoners to participate in, in order to have any real chance of receiving a parole date from the Board.

123. Such programs and services include but are not limited to jobs, education (beyond high-school (GED), vocations, and "self-help" programs, all of which are scarce and virtually non-existing at the majority of CDC institutions housing lifers.

124. Such programs and services are totally non-existent in PBSP-SHU with the exception of the fairly new opportunity for SHU prisoners who qualify to study for, and obtain their GED.

125. This program is conducted via the PBSP Education Department providing prisoners with material to study in their cells, as well as lessons being conducted via an institutional TV channel.

126. This in itself demonstrates the ability of defendants, including Hickman, Alameida, Woodford and McGrath, and Does to provide all SHU prisoners who want to participate with additional educational, vocational, and 'self help' programs via the same process as the GED program, without any safety or security concerns.

127. Yet they have declined to do so for reasons described in the previous paragraphs (paragraph $46, for example), all of which has caused serious injury to many PBSP-SHU prisoners, including plaintiffs, by affecting their chance of getting a parole date (not to mention public safety in general).

128. Plaintiffs have both wanted to participate in all of the programs that the Board has said they needed to get into.

129. Troxell has participated in the GED program, passing all of the exams (except math, which he plans to retake in the future).

130. Ashker obtained his GED, but after his August 2003 parole hearing. He asked his Unit Counselor about the availability of some of the programs mentioned by the board.  The response was "First of all, you need to get out of SHU via 'debriefing' or 'inactive status.'"  She also suggested contacting the Education Department to inquire about self-help, and correspondence type vocational programs, as well as the Psychiatric Department for 'self-help' programs.

131. Ashker contacted Education and is following up on leads for correspondence courses (which he will have to pay thousands of dollars for, if he can even get approval).  Education has no 'self-help' courses for SHU prisoners.

132. The Psychiatric Department said they do not provide 'self-help' programs either.

133. Currently, defendants Woodford and McGrath are working towards making PBSP-SHU more punitive and a lot harder to prisoners to participate in the GED program.  McGrath has also halted SHU prisoners from obtaining hardcover books, which are what most educational books are.

134. They have proposed a new rule stating, "TV's and radios will no longer be allowed" in SHU.

135. McGrath banned hardcover books back in 2002 because "too many prisoners were 602'ing staff, alleging they damaged their books when removing the covers."

136. McGrath's motivation was thus a matter of retaliatory, group punishment, and Ashker has exhausted a 602 appeal challenging this policy a few months ago, after staff refused a religious book sent as a gift from his mom because it was hardcover.

137. Many prisoners cannot afford to pay large amounts of money in order to participate in programs the Parole Board requires before even giving any real consideration to a prisoner seeking parole.

138. Such programs should be available to all prisoners, including the plaintiffs.  Defendants are responsible for providing such programs because they are the ones in control and such programs are a parole requirement, and help improve public safety in general by reducing recidivism by better preparing prisoners for their reintroduction to society.

139. Defendants have all been aware of this, yet they have chosen to do the opposite by cutting off programs and warehousing prisoners, while subjecting prisoners to a 'no-parole' policy, while citing SHU status, and 'failure to program' to justify the denials.

140. Plaintiffs have been subject to defendants' illegal, unjustified actions for the past 12 to 19 years now, and they are left with no reasonable means of obtaining relief other than court action.

## VI.
### PLAINTIFFS' FIRST CLAIM FOR RELIEF
### VIOLATION OF FIRST AMENDMENT
### (RIGHT TO ASSOCIATE)

141. Plaintiffs refer to and incorporate by reference herein the allegations of paragraphs 1 through 140, inclusive.

142. This is an action for violation of 42 U.S.C. Section 1983 based on defendants' violations of plaintiffs right to associate under the First Amendment to the U.S. Constitution.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          36

143. Defendants, and each of them, while acting under color of law, consciously disregarded with deliberate indifference to plaintiffs' federally protected rights, namely here the First Amendment right of association.

144. Defendants Gomez, Alameida, Woodford, McGrath, and Doe(s) have labeled plaintiffs associates and/or members of the Aryan Brotherhood Prison Gang based on 'confidential information' provided by inmate informants.

145. Defendants have subjected plaintiffs to the extremely punitive conditions of SHU, for the past 12-18 years, based on their alleged 'association' status, which in turn, has caused them on-gong irreparable injury by preventing them from participating in programs required by the Parole Board in order to have any change of obtaining a parole release date.  Such SHU placement is based solely on "association" rather than personal involvement in "illegal gang activity. (e.g. You can do absolutely nothing wrong, just the mere fact of association with them violates you and puts you in a no parole, ever, status.

146. Defendants actions have also contributed to plaintiffs being subjected to the Parole Board's "No Parole-Policy" and illegal gang classification system for prisoners in SHU on indeterminate status based on the gang association label, and failure to program.  It is on the basis of this illegal "no parole policy" that the defendants have based their decisions to deprive plaintiffs of their associational rights.

147. Defendants Gomez, Alameida, Woodford, McGrath, and Doe(s)' actions violate the First Amendment, to the U.S. Constitution, right to associate, in violation of 42 U.S.C. 1983, which bars punishment on basis of association.

148. Plaintiffs do not challenge here the legitimate penological goals and programs that vest defendants with a wide range of deferential and discretionary functions.  Plaintiffs point out here that where the premise of depriving plaintiffs of their right to associate turns out to be a false premise, that then the right to violate their association right goes with it.  Also, the power of the government should be to eliminate conduct, not just innocent associational conduct.

149. Defendants Wilson, Davis, Schwarzenegger, Hickman, Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, and Doe(s) have subjected plaintiffs to a "no parole policy" based on the other above named defendants' allegations that they are members of a prison gang, and submitting them to SHU indeterminate status.  The SHU status has in turn has made their participation in the programs necessary for any real consideration for release on parole virtually impossible over the last 12-18 years.

150. Plaintiffs have forever lost the benefits of 12-18 years of solid programming.  This deprivation is continuing, and is causing both plaintiffs, and each of them, on-going irreparable injury in violation of the First Amendment to the U.S. Constitution, for which they are without an adequate remedy at law.  Plaintiffs request all injunctive relief available under the Federal Civil Right Act.

151. As a proximate result of defendants' conduct, plaintiffs have suffered and continue to suffer general damages in an amount according to proof, but in excess of $10,000,000 in terms of loss of parole opportunities, and continuous confinement in SHU (for 12-18 years, and counting) without any hope of ever being released from SHU, or prison. Plaintiffs each and both claim emotional distress damages. Plaintiffs will continue to suffer such damages in the future, and the damages of lost opportunities of doing beneficial programming.

152. In acting as described herein above, defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

153. Defendants, and each of them, while acting under color of law, consciously disregarded with deliberate indifference to plaintiffs' federally protected rights, namely here the First Amendment right of association.

## VII.
## SECOND CLAIM FOR RELIEF
## VIOLATION OF FIRST AMENDMENT
## FREEDOM OF SPEECH

154. This is a claim against defendant Joe McGrath only. Defendant McGrath's retaliatory policy of banning hardcover books has resulted in plaintiffs' not being able to receive hardcover books, and constitutes a violation of the First Amendment to the U.S. Constitutional right to receive reading material, for which plaintiffs seek damages and injunctive relief.

155. Plaintiffs do not challenge any policy that permits CDC staff to physically remove the hard covers of any hardcover book.  One of the problems this blanket "no hardcover books in SHU" causes is that many books only come in hardcover form.

156. McGrath was deliberately indifferent to and acted with conscious disregard for imposing a ban on all hardcover books at SHU.  He has an easy alternative of simply removing the hard covers.  His claims of inmate lawsuits over this are simply efforts to justify his conduct.  It shouldn't work to justify it since no inmate will get anywhere with such a suit.

157. As a proximate result of defendant McGrath's conduct, plaintiffs have suffered general damages in an amount according to proof, but believed to exceed $10,000.

158. Defendant McGrath's conduct is continuing, and is expected to continue in the future. Plaintiffs have and will suffer irreparable harm, as they have no adequate remedy at law. Plaintiffs thus request injunctive relief.

Wherefore plaintiffs pray for relief as set forth below.

## VIII.
## THIRD CLAIM FOR RELIEF
## VIOLATION OF FIFTH AMENDMENT
## RIGHT AGAINST SELF-INCRIMINATION,
## LOSS OF CONDITIONAL LIBERTY

159. Plaintiffs refer to and incorporate by reference herein the allegations of paragraphs 1 through 158, inclusive.

160. This is a claim for violation of 42 U.S.C. Section 1983 against defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez for violation of plaintiffs Fifth Amendment rights against self-incrimination and Fifth and Fourteenth Amendment rights to procedural and substantive due process of law.

161. Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez have kept the plaintiffs continuously confined in SHU, subject to 'indeterminate' status (solely for administrative reasons), subsequent to sticking 'gang-associate' labels on them.  The support for which is 'confidential information,' provided by prisoner informants.

162. Plaintiffs have always denied the gang association/membership labels, and they have also been substantially hindered in their ability to attack such labels in any meaningful fashion because of the alleged 'confidential' nature of the information being used against them to the extent that no real specifics are ever provided.

163. Defendants have kept them on this status for 12-18 years, and counting; and have promulgated policies and procedures, which mandate that plaintiffs' sole means of obtaining a release from SHU, and the progressively punitive conditions therein, are to parole, die, or debrief.  To debrief one necessarily has to give self-incriminatory information.  The officials never believe an inmate that doesn't also confess to his own crimes.

164. Plaintiffs' are lifers, subject to the Parole Board's 'no parole policy' for SHU status.  Thus, they are left with the 'Hobson's Choice' of never getting out of prison, and dying in SHU; or becoming a CDC informant, and thereby placing the lives of family, friends, and their own in serious danger.  Plaintiffs must also incriminate themselves, a requirement here that would require plaintiffs to make stuff up.  The incriminating information may later used against them for prosecution of crime(s), for perjury, and/or the Parole Board's using such against them at parole hearings.

165. While on SHU 'indeterminate' status, plaintiffs have suffered, and continue to suffer, irreparable injury for exercising their rights to remain silent, in the loss of conditional liberty and emotional distress, which is compulsion prohibited by the Fifth Amendment to the U.S. Constitution, and the substantive and procedural safeguards of the due process clause of the Fifth and Fourteenth Amendments to the U.S. Constitution.

166. Defendants Wilson, Davis, Schwarzenegger, Hickman, Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, and Doe(s) have a 'no parole policy' for prisoners on SHU 'indeterminate' status, solely for administrative reasons based on CDC defendants' gang label.

167. Defendants above named (through their acts, and/or failures to act), have denied plaintiffs' parole dates based on their gang association 'indeterminate' SHU status, and subsequent failures to program over the past 12-18 years, and counting.

168. Defendants have informed plaintiffs that they need to "get out of SHU," and upgrade their educational/vocational skills, obtain good work records, and complete 'self-help' programs. They then set the date for their next parole consideration hearings five years away (the maximum allowed by law.)

169. Defendants are aware of the "Hobson's Choice."  This presents to the plaintiffs, in so far as their sole means for compliance with their directions is for plaintiffs to agree to become CDC informants.  They must also inform on themselves.  If you don't admit to some kind of criminal conduct that you yourself have done, then you haven't debriefed.

170. Thus, the cost of plaintiffs exercising their right to silence is the loss of conditional liberty, as well as emotional distress, which is forcing a person to incriminate themselves, a compulsion prohibited by the Fifth Amendment to the U.S. Constitution.  By using the refusal to debrief as a basis to continue plaintiffs' indeterminate SHU assignment, defendants have further violated plaintiffs' rights to substantive and procedural due process of law.  Defendants' cannot punish plaintiffs' for the exercise of his Fifth Amendment rights against self-incrimination.

171. As a proximate result of defendants' conduct, plaintiffs have suffered, and continue to suffer, general damages according to proof in excess of $10,000,000 in the form of loss of parole opportunities and continuous confinement in SHU (for 12-18 years, and counting), without any hope of being released from SHU, or prison.  Plaintiffs also claim damages of emotional distress. Plaintiffs will continue to suffer such damages into the future.

172. In acting as described herein above, defendants acted knowingly, willfully, and maliciously, or with reckless or callous disregard for plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

173. Defendants' conduct is continuing and is expected to continue into the future.  Plaintiffs have and will continue to suffer irreparable harm for which there is no adequate remedy at law, and request all injunctive relief available under the Federal Civil Rights Act.

Wherefore, plaintiffs pray for relief set forth below.

## IX.
## FOURTH CLAIM FOR RELIEF
## EIGHTH AMENDMENT VIOLATION
## CRUEL AND UNUSUAL PUNISHMENT

174. Plaintiffs refer to and incorporate by reference herein the allegations of paragraphs 1-173, inclusive.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          44

175. This is a claim for relief under 42 U.S.C. Section 1983 against defendants Schwarzenegger,

Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch,

Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez for violating plaintiffs' rights under

the Eighth Amendment's prohibition of cruel and unusual punishment.

176. The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain," and

punishment that is "grossly disproportionate to the severity of the crime."

177. Plaintiffs' submit that the 'debriefing process' (that defendants require them to 'successfully

complete' in order to be released from SHU, as well as being able to have any real chance of

release on parole), is cruel and unusual punishment.  Not only would their lives and well beings

be placed at risk, but the lives and well beings of their family members, and friends as well if

they were to implicate others in criminal and/or gang activity.

178. Making a no parole policy on SHU inmates that chose not to debrief constitutes cruel and

unusual punishment in violation of the Eighth Amendment.

179. Defendants Gomez, Hickman, Alameida, Woodford, McGrath, and Doe(s) are each

personally aware of the fact that 'informants' are targets, as are informants' family members and

friends.  Each of these defendants knows of (and/or is responsible for knowing of) numerous

incidents of informants, and/or their families and friends, on the streets being threatened,

attacked, and subject to physical harm, and killed.  These defendants all know that it is simply

not possible to ensure the safety of any prisoner in CDC, and their abilities to make such

assurances with regards to their informants is even lower.  Even the informants housed in CDC's

'protective custody' units have been the subject of assaults, producing great bodily injury.

(Based on information and belief)  They have no way of assuring the safety of family members

or friends on the street either.


180. The debriefing policy also gives a huge incentive for inmates to lie.  Defendants are well

aware of the fact that many debriefings contain all sorts of lies.  These lies then become a basis

of trying an inmate into a gang, and thus submitting them to indefinite SHU status.


181. Thus, defendants' requirement that plaintiffs' 'debrief' in order to get out of the

progressively punitive conditions of SHU, knowing they would be deemed 'informants,' and

thereby face a life-long, constant threat of serious harm to themselves (and to their family

members and friends outside of prison), constitutes 'deliberate indifference' and conscious

disregard to plaintiffs rights under the Eighth Amendment prohibition against cruel and unusual

punishment.


182. Defendants Gomez, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Lehman,

Roos, Welch, Granlund, Starn, Risen, Moore, Wilson, Davis, Schwarzenegger, and Doe(s) are all

'deliberately indifferent' to plaintiffs (and their family members and friends) lives and well

beings, by mandating that they agree to become 'successful CDC informants" in order for release

from SHU and in order to receive any 'meaningful consideration' for parole.  This policy

constitutes cruel and unusual punishment.

183. Defendants Gomez, Alameida, Woodford, McGrath, Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Wilson, Davis, Schwarzenegger, Hickman, and Doe(s) subject plaintiffs to a 'no parole policy' and giving them the Hobson's Choice of: (1) staying in the restrictive conditions of SHU without program opportunities (for 12-18 years, and counting) until they die, or (2) becoming their 'informant,' and subject to the consequences of that label for the rest of their lives (as described above).  This constitutes the unnecessary and wanton infliction of pain, and/or punishment that is grossly disproportionate to the severity of the 'crime' (a gang label without reliable evidence of any participation in illegal activity related to any gang, and sentences of 'life, with the expectation of receiving a parole date'), as well as 'deliberate indifference' as detailed above; all of which violate the Eighth Amendment.

184. As a proximate result of defendants conduct, plaintiffs have suffered and continue to suffer general damages according to proof, but in excess of $10,000,000 in the form of loss of parole opportunities, and continuous SHU confinement, without program opportunities required by the Parole Board, and which in turn has them subject to the Board's "no parole" policy, as well as emotional distress.  Plaintiffs will continue to suffer such damages in the future.

185. Defendants' conduct is continuing and is expected to continue into the future.  Plaintiffs have and will continue to suffer irreparable harm for which there is no adequate remedy at law, and request all injunctive relief available under the Federal Civil Rights Act.

186. In acting as described herein above, defendants acted, knowingly, willfully, and

maliciously, or with reckless or callous disregard for plaintiffs federally protected rights,

entitling them to an award of exemplary and punitive damages.


Wherefore, plaintiffs pray for relief as set forth below.


**X.**
**FIFTH CLAIM FOR RELIEF**
**FOURTEENTH AMENDMENT VIOLATIONS**
**EQUAL PROTECTION**
**DUE PROCESS**

187. Plaintiffs refer to and incorporate by reference herein in the allegations of paragraphs 1

through 186, inclusive.


188. The Fourteenth Amendment imposes an obligation to the states to safeguard the rights

under the U.S. Constitution.  Plaintiffs, and each of them, state a Fourteenth Amendment claim

for relief as based on four violations, each of which constitutes a separate violation, and

constitute a further violation from the cumulative affects of being combined together.  The four

claims for relief here are:

**A)** Defendants' Violation of the Ex-Post Facto Clause (Art. I, Section 9 U.S. Constitution)

(Retroactive punishments);

**B)** Defendants' Violation of Equal Protection Clause – Procedural and Substantive due process

(deprivations of liberty exceeding their sentence(s) in an unexpected, unlawful manner);

**C)** Defendants' Violation of the Equal Protection Clause – Procedural and Substantive due process (deprivations of a state created liberty interest or 'real substance' i.e. statutory expectation of receiving a parole release date; opportunities, and access to programs required by the Parole Board in order for meaningful consideration by the Board concerning parole; and release from SHU on 'inactive' status, when no 'reliable evidence' is present to demonstrate participation in recent illegal gang activity); and

**D)** Unequal treatment based on race (defendants subjecting white to more isolation from their social group than other races housed at PBSP-SHU.

189. Defendants Gomez, Alameida, Woodford, McGrath, an Doe(s) have violated the Fourteenth Amendments prohibition on 'retroactive punishments' per the Ex-Post Facto Clause (Art I, Section 9 U.S. Constitution), in the following manner.  The SHU "no parole policy" and its sub-aspects as described above, have affectively after the fact transformed plaintiffs' convictions with sentences allowing for parole into  murder convictions into convictions with a sentence of "life without parole."

190. Plaintiffs were each labeled gang associates/members by CDC staff prior to defendants' enactment of any policies, or practices, which subjected CDC prisoners to punitive sanctions based solely on such alleged 'associations.'

191. It was not until years after they entered prison that CDC began to sanction prisoners for mere 'association,' and/or 'gang membership.'  Plaintiffs have been continuously subject to defendants "SHU indeterminate" status, and denied access – opportunities, to the programs required by the Parole Board in order to receive 'meaningful consideration' of a parole date, for the past 12-18 years, and counting.

192. Such programs were supposed to be made available to them by defendants per C.C.R. Title 15 Article 3, work and education, Section 3040(c),

> "A classification committee <u>shall assign each inmate</u> to an appropriate work, education, vocation, therapeutic, or other institutional programs…" See also C.C.R. Title 12 Section 4434, conditions of segregated housing…(k) Institution programs and services.  "Inmates assigned to segregated housing units <u>will be permitted to participate and have access to</u> such programs and services as can be reasonably provided within the unit without endangering security or safety of persons.  Such programs and services <u>will include</u>, but <u>are not limited to</u>: education, commissary, library services, social services, counseling, religious guidance and recreation."  (Emphasis added)

193. Defendants' acts and/or failures to act, have thus prevented plaintiffs from opportunities to participate in programs necessary in order for them to meet the Board's 'parole eligibility requirement,' which in turn, has altered their chance of ever getting a parole date; thus causing them substantial, irreparable injury.

194. Defendants above named are also substantially responsible for subjecting plaintiffs to the Board's 'no parole policy' for those prisoners in SHU on 'indeterminate status,' due to 'gang association' status, and failure to program.

195. Plaintiffs' equal protection claim (Para. 188(b)) is based on the following: Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez have denied plaintiffs request(s) for release from SHU for meeting 'inactive' criteria, without just cause, or 'reliable information.' Defendants policy and/or practices of keeping white prisoners housed in PBSP-SHU nearly completely isolated from their social group (other whites), while placing other races together (with their various social groups) constitutes unequal treatment by race. Such unequal treatment by race is even more glaring when looked at in the context that there are currently over 60,000 gang members in CDC's general population prisons who are African American or Latino; many of whom have recent disciplinary activity (within the past 2-5 years), yet a handful of whites (who have no serious rule violations in the past 6-20 years) are kept in SHU forever (5th and 14th Amendments), including plaintiffs. (Based on information and belief.)

196. Plaintiffs' due process claims (Para. 188(c)) are based on the following: plaintiffs have a due process (5th and 14th Amendments) liberty interest in release on parole, subject to protection under the substantive due process clause of the Fifth and Fourteenth Amendment.  The right of parole is a significant liberty right embedded into state law, thus creating a legitimate expectancy of state after compliance therewith.  This liberty interest arises because California's parole scheme creates a presumption that parole release will be granted, as per the mandatory language and legislative intend contained in California Penal Code 3041(b).)

197. Defendant Wilson, Davis, Schwarzenegger, Hickman, Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, and Doe(s) through their acts, and/or failures to act, have all chosen to disregard the law(s), statutes, and legislative intent concerning California's 'indeterminate sentence law' concerning murderers, as described in the complaint.  These defendants have used CDC's gang label(s) against them (fully aware that such labels are based on 'undisclosed allegations' made by CDC informants; the very nature of which prevents plaintiffs from being able to challenge the label(s).)  Defendants also use their 'indeterminate SHU status' and failure to program as their justification for subjecting plaintiffs to what is a blanket 'no parole' policy for prisoners on 'indeterminate' SHU status; constituting a denial of due process and Ex-Post Facto violation, by their use of categorical rather than individual criteria and changing their sentences.

198. Each of the defendants named in this action, through their acts, and/or failures to act, have taken away any and all hopes the plaintiffs ever had for getting a parole date, and being release someday because of defendants' policy(s)/practices over the past 12-18 years, and counting. Giving plaintiffs a Hobson's Choice, to wit: agreeing to become a 'successful CDC informant(s)' (and thereby subject themselves, as well as their family members and friends to a lifetime of problems described above); or, be continuously subject to the progressively more punitive SHU conditions, until they die; all of the above which violates due process clause of the Fourteenth Amendment to the U.S. Constitution.

199. As a proximate result of defendants' conduct, plaintiffs, and each of them, have suffered and continue to suffer general and compensatory damages in an amount according to proof, but in excess of $10 million.

200. Defendants' conduct is continuing and is expected to continue into the future.  Plaintiffs have and will continue to suffer irreparable harm for which there is no adequate remedy at law, and request all injunctive relief available under the Federal Civil Rights Act.

201. In acting as described herein above, defendants acted, knowingly, willfully, maliciously, or with callous or reckless disregard for plaintiffs' federally protected rights, entitling them to an award of exemplary and punitive damages.

Wherefore, plaintiffs pray for relief as set forth below.

## IV.
## SIXTH CLAIM FOR RELIEF
## STATE LAW CLAIM FOR NEGLIGENCE

202. Plaintiffs refer to and incorporate by reference herein the allegations of paragraphs 1 through 201, inclusive.

203. Plaintiffs have complied with the notice of tort claims requirements of Cal. Gov. Code Section 910.  The claim was rejected by operation of law 45 days later when no one responded to it.

204. This is a state law claim for damages and injunctive relief based on negligence for violations of duties of care and *per se* negligence for violation of 15 CCR Sections 3040 and 3343(k).

205. The actions of defendants Gomez, Hickman, Alameida, Woodford, and McGrath in failing to provide plaintiffs with opportunities to participate in meaningful, rehabilitative programs (that are required by the Board of Prison Terms in order to have any reasonable chance of getting a parole date), such as, but not limited to, educational, vocational, and self-help courses over the past 12-18 years, were done negligently in violation of 15 CCR Sections 3040, and 3343(k) Defendants are liable for negligently violating  their duties of due care and/or duties arising from 15 CCR Sections 3040 and 3343(k).  Defendants have also violated the intent of the 'indeterminate sentencing law' (ISL), as defined in In re: *Minnis* 7 Cal.3d 639, 644 (1972):

"The purpose of the indeterminate sentencing law(s)…place emphasis upon the reformation of the prisoner…and with it…a hope and prospect of liberation from prison…at the earliest period when permitted by law…under the restrictions and conditions of a parole."

206. The actions of defendants Wilson, Davis, Hickman, Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Schwarzenegger, and Doe(s) actions and/or omissions (as described and alleged above such as, but not limited to, the creation of a blanket 'no parole' policy, which is applied by the Board to routinely deny parole dates to those prisoners CDC has placed on SHU 'indeterminate' status, and denied access and opportunities to be able to participate in rehabilitation programs.

207. The defendants, and each of them, have all negligently used CDC's 'gang member' association status against plaintiffs, and have wrongly predicated the plaintiffs chance(s) of ever receiving meaningful consideration for a parole date by giving them a "Hobson's Choice" of: agreeing to become 'successful CDC informants,' and thereby get out of SHU and be able to program (when everyone knows that Governor's Davis and Schwarzenegger, and Secretary Hickman, and CDC Directors Alameida and Woodford, Warden McGrath, and Doe(s) policies and practices have all contributed to rehabilitative programs to be practically non-existent for all lifers, especially those confined in PBSP; or living the rest of their lives without any hope of ever getting a parole date.

208. Defendants know, or should know, that this inmate debriefing process produces false links to crimes, all given to CDC officials to get a "get out of Pelican Bay SHU" card.

209. Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez conduct is continuing, and is expected to continue in the future.  Plaintiffs have and will suffer irreparable harm, as they have no adequate remedy at law.  Plaintiffs thus request injunctive relief.

210. As a proximate result of defendants' negligent conduct, plaintiffs, and each of them, have suffered and continue to suffer general and compensatory damages in an amount according to proof, but in excess of $10 million.

Wherefore, plaintiffs pray for relief as set forth below.

## VII.
## SEVENTH CLAIM FOR RELIEF
## STATE LAW CLAIM OF INTENTIONAL TORT

211. Plaintiffs incorporate by reference herein the allegations of paragraphs 1 through 211, inclusive.

212. Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez intentionally deprived plaintiffs of their parole rights with an intentional and malicious intent.

213. The provisions of California Penal Code 3041(a) and (b) set forth mandatory duties which defendants knowingly violated as follows:

> "In order to comply with the parole policy established by the legislature in Penal Code 3041(a), the Board must weigh the inmates' criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes. The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the legislature for the offenses under consideration (and suggested by the matrix), in order to arrive at an uniform term of confinement…The Board of Prison Term…'shall normally set a parole release date at the inmates' initial eligibility hearing…'"

In re: *Ramirez*, 94 Cal. App4th  549 (2001), wherein the court also noted at page 564:

> "…Nor could the Board routinely deny parole for a certain class of prisoners under a blanket policy of the kind condemned in In re: *Minnis*, supra, and shield itself with a case by case invocation of the 'some evidence' standard."

214. Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez conduct is continuing, and is expected to continue in the future.  Plaintiffs have and will suffer irreparable harm, as they have no adequate remedy at law.  Plaintiffs thus request injunctive relief.

215. As a proximate result of defendants' intentional conduct, plaintiffs, and each of them, have suffered and continue to suffer general and compensatory damages in an amount according to proof, but in excess of $10 million.

216. Defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez acted oppressively, maliciously, and intentionally which warrants an award of exemplary damages according to proof.

Wherefore, plaintiffs pray for relief as set forth below:

**PRAYER FOR RELIEF**

Wherefore, plaintiffs Ashker and Troxell pray for the following relief:

1) For judgment in favor of plaintiffs Todd Ashker and Danny Troxell as to each and all of the claims for relief set forth in this complaint, and against defendants Schwarzenegger, Hickman, Alameida, Woodford, McGrath, Daly, Lawin, Terhune, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Davis, Wilson, and Gomez

2) For Injunctive relief, which includes, but is not limited to, the following:

    a. Enjoining defendants Hickman, Woodford, and McGrath to implement program opportunities for SHU 'indeterminate' prisoners consisting of education, vocation, and self-help courses, which said prisoners can participate in and receive credit for at their Parole Board hearings.

    b. Enjoining defendants from keeping plaintiffs in SHU, on indeterminate status based on CDC's 'gang member association' status – label(s), absent, credible, reliable evidence which demonstrates that plaintiffs have been directly involved in recent illegal gang activity.

    c. Enjoining defendants Daly, Lawin, Lehman, Roos, Welch, Granlund, Starn, Risen, Moore, Hickman, and Doe(s) from using a blanket 'no parole' policy for prisoners subject to CDC's SHU 'indeterminate status' for administrative reasons.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)       59

d. Enjoining defendants named above from subjecting the plaintiffs to the "Hobson's Choice" of: agreeing to become a CDC informant, and getting out of SHU, prior to receiving meaningful consideration for parole.

e. Enjoining defendants named above from using the plaintiffs' inability to participate in rehabilitation programs (for the past 12-18 years, and counting) against them at future hearings.

f. Enjoining defendants, above named, from using CDC's gang member association labels against plaintiffs, absent additional due process protection (i.e. full, detailed disclosures pertaining to the information relief upon to support such labels, such as the name(s), dates, and specific statements from CDC's sources.)

g. Enjoining defendants, above named, to follow the statutory law(s) and legislative intent, contained in Penal Code 3041.

h. Such other further injunctive and other equitable relief as the court deems appropriate.

3. Plaintiffs request the appointment of a master to monitor compliance with any injunction issued herein.

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          60

4. Plaintiffs request a declatory judgment defining the rights and obligations of each of the parties named herein.

5. Plaintiffs Todd Ashker and Danny Troxell each request compensatory damages from each and all of the defendants according to proof in excess of in the amount of $10,000,000.00 (ten million dollars).

6. Plaintiffs request punitive damages against each and all of the defendants, according to proof.

7. Plaintiffs request attorney's fees according to proof, pursuant to 42 U.S.C. 1988.

8. Plaintiffs request costs of suit.

9. Plaintiffs request trial by jury on all issues triable.

10. Plaintiffs request such further relief as the court deems just, proper, and equitable.

Respectfully Submitted,

_____                    Dated: May ___, 2004
Herman Franck, Esq. (SB# 123476)
Attorney for Plaintiffs
Todd Ashker & Danny Troxell

CIVIL RIGHTS COMPLAINT FOR
DAMAGES, INJUNCTIVE, AND
DECLATORY RELIEF (WITH
SUPPLEMENTAL STATE LAW CLAIMS)          61

**Demand for Jury Trial**

Plaintiffs Todd Ashker and Danny Troxell herewith demand trial by jury as to all issues triable to a jury.

Respectfully Submitted,

_____                    Dated: May ___, 2004
Herman Franck, Esq. (SB# 123476)
Attorney for Plaintiffs
Todd Ashker & Danny Troxell