United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD LEWIS ASHKER and DANNY TROXELL, | No. C 04-1967 CW |
| Plaintiffs, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| ARNOLD SCHWARZENEGGER; R.Q. HICKMAN; EDWARD ALAMEIDA, JR; JEANNE WOODFORD; JOE MCGRATH; CAROL A. DALY; SHARON LAWIN; CAL TERHUNE; GEORGE LEHMAN; MR. ROOS; BOOKER T. WELCH; BRETT GRANLUND; LARRY STARN; KENNETH L. RISEN; JONES M. MOORE; GRAY DAVIS; PETE WILSON; JAMES GOMEZ; and DOES 1 through 10; | |
| Defendants. | |

Plaintiffs Todd Ashker and Danny Troxell move for summary judgment on Plaintiff Ashker's claim that Pelican Bay State Prison's ban on hardcover books violated his First Amendment rights. Defendant Joe McGrath opposes the motion and cross moves for summary judgment. Plaintiffs oppose Defendant's cross-motion.

1  The matter was heard on March 3, 2006.  Having considered all of
2  the papers filed by the parties, the evidence cited therein and
3  oral argument on the motions, the Court grants in part Plaintiffs'
4  motion for summary judgment and grants in part Defendant's cross-
5  motion for summary judgment.

## BACKGROUND

Plaintiffs are prisoners of the State of California who are incarcerated in the Security Housing Unit (SHU) at Pelican Bay State Prison (PBSP).

The California Code of Regulations provides that prisoners can purchase softcover books.  15 C.C.R. § 3138(f)(1).  It is silent as to whether prisoners can purchase hardcover books.  In January, 2000, PBSP's Operational Procedure No. 806, however, stated that, "No hardbound books are allowed."  This remained the written policy for several years.  But, in practice, hardbound books were allowed in the SHU as long as the hard covers were removed.  As a staff member wrote on July 22, 2002, "It is our policy to remove the covers, even though the OP 806(L)(6) states, 'No hardbound books are allowed.'"  Dec. of Frank Clement, Ex. C (Inmate/Parolee Appeal Form).  Before a hard cover could be removed, an inmate would have to sign an agreement that allowed the PBSP staff to remove the hard cover and absolved PBSP and its staff from liability for removing the cover.

At some point, however, the no hardbound books policy was enforced.  According to Plaintiff Ashker, the PBSP-SHU staff did not enforce this policy until after this Court, in September, 2002, issued a permanent injunction that enjoined PBSP from prohibiting

2

inmates from receiving books, periodicals, magazines or calendars solely because a book label approved by the prison was not attached.[1]  See <u>Ashker v. Cal. Dep't of Corrections</u>, 224 F. Supp. 2d 1253, 1264 (N.D. Cal. 2002).  Another inmate states that he became aware that he could not receive hardbound books, even with the covers removed, on July 15, 2002, when he received a 2002 book label form that stated "hard cover book(s) are not allowed at Pelican Bay State Prison."  Clement Dec., Ex. A.  Still other inmates state that it was not until 2003 that they were no longer able to receive hardcover books from publishers.  <u>See, e.g.</u>, Dec. of Danny Troxell.

In December, 2003, Plaintiff Ashker's family sent him a book titled, <u>Daily Guideposts 2004: Spirit-Lifting Thoughts for Every Day of the Year</u>.  Because it was a hardcover book, PBSP would not allow Ashker to have the book, even with the cover removed.  Ashker filed an Inmate/Parolee Appeal Form, objecting that the book was withheld from him and arguing that there was no legitimate reason for not allowing hardcover books, subject to cover removal.  At the informal level, Ashker's appeal was denied:

> OP 806, signed by the Warden, states hard bound books are not allowed.  Due to appeal issues when hard-bound books had there [sic] covers removed, and making inmate alter a $60.00 to $100.00 book, it is no longer practiced.  Also most books are offered in soft covers after they are released.

---

[1] In their papers, Plaintiffs state that the enforcement of the no-hardbound-books policy was in retaliation for Ashker having prevailed in the book label case.  But this allegation is not in their complaint.  Instead, their complaint alleges that Defendant enforced the policy in retaliation for inmates complaining that staff damaged their books while removing the hard covers.

3

...

1  Dec. of Todd Ashker, Ex. D.  Ashker's appeal was also denied at the
2  formal level.  Attached to the denial of his appeal was an October
3  21, 2002 memorandum from former Warden, Defendant McGrath, stating
4  that book purchases will not require a book label and that the
5  "current PBSP policy of ten books in possession, new books only and
6  no hardbound books, remains unchanged."  Id.

7  Ashker's appeal was denied on the second-level review and the
8  third-level review as well.  The denial from the second-level
9  review, written by Defendant McGrath, found that the prohibition on
10 hardcover books complies with legitimate penological interest:
11 unlike the cover on a softcover book, the "cover of a hardcover
12 book has many places to hide contraband."  But, Defendant McGrath
13 recognized, "There is an exception.  The covers can be removed from
14 a hardcover book, and the inmate can be issued the book without its
15 book cover.  This eliminates all the potential hiding places
16 associated with a hard cover book."  The problem with removing the
17 cover, however, is

> it also diminishes the durability of the book.  The publisher did not intend handling of the book without the cover, so this solution has its own problems.  In general, the institution does not support removing the covers from hardcover books.  Millions of books are available with a soft cover binding.  Restricting an inmate to soft cover books should not result in a significant reduction of access.  The institution has determined that some educational programs do not have soft cover books available for their correspondence courses.  In this case, the institution allows the hardcover books with the covers removed as there is no practical alternative.  The present policy is the most reasonable approach.  In general, hardcover books are prohibited from Security Housing Unit (SHU) inmates.

26 Id.

27 In May, 2004, Operation Procedure No. 806 was revised.  The

4

new policy stated, "No newly purchased hardbound books are allowed. Only hardbound books received through an approved correspondence course (educational books), and previously owned hardbound books will be modified to meet this security requirement." Dec. of S. Kays, Ex. A. Under this policy, Plaintiff Ashker, after he signed a "Statement of Agreement to Modify Hard Cover Educational Books," was able to receive the hardcover books required for an approved paralegal correspondence course he was taking. Ashker Dec., Ex. E.; Kays Dec., Ex. E. But he was not permitted to obtain other educational hardbound books that were not part of his approved correspondence course. Ashker Dec. ¶ 25.

In December, 2005, approximately one and a half years after Plaintiffs filed this action, the hardcover book policy contained in Operation Procedure No. 806 was again revised. It now allows inmates to have books that are "paperback or hardback with covers removed." Kays Dec., Ex. C (Personal Property Plan, p.5). On January 23, 2006, Warden Richard Kirkland sent a memorandum to all staff. The purpose of the memorandum was to "reiterate/clarify the Pelican Bay State Prison Personal Property Schedule -- 2005 addendum dated December 16, 2005, as related to the issuance of allowable books." Id., Ex. D. The memorandum stated that "all hardcover books are permitted with the cover removed. This applies to both educational and non-educational type books. While staff may determine a book not meeting all requirements to be unauthorized, determination will not be based solely upon a book's cover." Id.

5

LEGAL STANDARD

I.  Motion for Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir.

2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Id.

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id.

7

This is true even though the non-moving party bears the ultimate burden of persuasion at trial. <u>Id.</u> at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a <u>prima facie</u> showing in support of its position on that issue. <u>UA Local 343 v. Nor-Cal Plumbing, Inc.</u>, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. <u>Id.</u>; <u>see also Int'l Shortstop, Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1264-65 (5th Cir. 1991). Once it has done so, the non-moving party must set forth specific facts controverting the moving party's <u>prima facie</u> case. <u>UA Local 343</u>, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." <u>Id.</u> This standard does not change merely because resolution of the relevant issue is "highly fact specific." <u>Id.</u>

II. Prisoners' Constitutional Claims

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." <u>Turner v. Safley</u>, 482 U.S. 78, 84 (1987). Where prison rules or regulations impede the exercise of a prisoner's constitutional rights, federal courts must discharge their duty to protect those rights. <u>See id.</u> However, courts must be aware that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." <u>Id.</u> (citation and internal quotation marks omitted). Where the regulations of a State prison are involved, "federal courts have . . . additional reason to accord deference to the appropriate

8

prison authorities." Id. at 85 (citation and internal quotation marks omitted).

A prison regulation that limits a prisoner's exercise of his or her constitutional rights will thus be upheld where it "reasonably relate[s] to a legitimate penological interest." Id. at 89-90. This determination entails consideration of four factors: (1) whether there is a rational relationship between the regulation and the proffered legitimate government interest; (2) whether inmates have alternative means of exercising their asserted rights; (3) how accommodation of the claimed constitutional right will affect guards, a prisoner's fellow inmates, and the allocation of prison resources; and (4) whether the policy is an "exaggerated response" to the jail's concerns. Id.; see also Mauro v. Arpaio, 188 F.3d 1054, 1058-59 (9th Cir. 1999).

DISCUSSION

I. First Amendment Claim

It is not disputed that Plaintiffs, even while incarcerated in the SHU, retain First Amendment rights not inconsistent with their status as prisoners or with legitimate penological objectives of the corrections system. See Pell v. Procunier, 417 U.S. 817, 822 (1974); Prison Legal News v. Cook, 238 F.3d 1145, 1149 (9th Cir. 2001). Regulations affecting prisoners' access to publications are valid only if they are reasonably related to legitimate penological interests. See Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (citing Turner, 482 U.S. at 89). Regulations to be viewed with caution include those which categorically prohibit access to a

9

broad range of materials. See Keenan v. Hall, 83 F.3d 1083, 1093 (9th Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998) (allowing challenge to prison's "publisher's only" rule that applied to softcover books); see also Johnson v. Moore, 948 F.2d 517, 520 (9th Cir. 1991) (rule categorically preventing inmates from receiving softcover books and magazines not sent directly from publisher must be scrutinized closely).

In the instant case, Plaintiffs contend that PBSP's no-hardbound-books policy impedes their ability to receive books, from legitimate commercial vendors, that are not available in soft cover, thus infringing their rights under the First Amendment. While Defendant states that millions of books are available in paperback, Defendant does not refute that, as noted in declarations submitted by Plaintiffs and other inmates, many books are not available in paperback, especially educational, legal and resource books. See, e.g., Dec. of Kenneth Johnson ¶ 6 ("It has been my personal experience that most of the books related to the subjects that I have focused my studies on (history, civics, law, philosophy, human anatomy) that are in depth, only come in hardback editions and are not available in soft cover editions."). Because this claim implicates Plaintiffs' right to receive numerous materials, this regulation must be reviewed closely. See Johnson, 948 F.2d at 520.

A. Rational Relationship

As stated above, the Court must first consider whether there is a rational relationship between PBSP's ban on hardcover books and the prison's proffered legitimate government interests. This

10

requires that the Court examine whether PBSP's objective is legitimate and neutral, and whether the policy is rationally related to that objective. See Mauro, 188 F.3d at 1059.

Defendant states that the reason behind the ban on hardcover books was to maintain security in the prison by limiting inmates' access to contraband and articles which could constitute safety hazards or a breach of security. Preventing the introduction of contraband and ensuring prison security are legitimate penological interests. Bell v. Wolfish, 441 U.S. 520, 553-55 (1979) (introduction of contraband); Casey v. Lewis, 4 F.3d 1516, 1520-21 (9th Cir. 1993) (same); Thornburgh, 490 U.S. at 415 (prison security); Mauro, 188 F.3d at 1059 (same). And, as the Supreme Court explained, "Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in Turner." Thornburgh, 490 U.S. at 415-16.

But PBSP's no-hardback-books policy is not rationally related to a legitimate and neutral objective. Turner's "rational relationship factor . . . is a sine qua non." Prison Legal News, 238 F.3d at 1151 (citing Walker, 917 F.2d at 385). Thus, where the prison regulation fails to satisfy this factor, the court need not consider the remaining factors. Id. The burden of proof in challenges to prison regulations is set forth in Frost v. Symington, 197 F.3d 348 (9th Cir. 1999). The initial burden is on the State to put forth a "common-sense" connection between its policy and a legitimate penological interest. If the State does

11

so, the plaintiff must present evidence that refutes the connection. Id. at 357. The State must then present enough counter-evidence to show that the connection is not so "remote as to render the policy arbitrary or irrational." Id.

The evidence Plaintiffs submit, and the evidence submitted by Defendant, refutes any common-sense connection between the no-hardbound-books policy and PBSP's legitimate goals of ensuring against contraband and providing prison safety. As noted above, in denying Ashker's request for his hardbound book, Defendant acknowledges that removing the cover from a hardbound book "eliminates all the potential hiding places." Defendant identifies "problems" with removing the hard covers: it diminishes the durability of the book and the publishers did not intend handling of the book without the cover. Those problems, however, are not related to prison security. Defendant's concern with the durability of books is not a legitimate penological interest.

In his cross-motion, Defendant further states that hardcover books are more complicated to process, and that hardcover books, without their covers, that fall apart are more difficult to search. With this statement, Defendant is able to meet his initial burden to put forth a "common-sense" connection between PBSP's policy and a legitimate penological interest. But this connection is refuted by declarations provided by Plaintiffs. Numerous inmates state that their hardcover books, with the covers removed, have not fallen apart and that, during their many years of incarceration in the SHU, they are aware of no issues with the books once their covers were removed. See, e.g., Troxell Dec. ¶ 14 ("I have never

12

seen or heard of hardcover books with covers removed being a security problem during my 15 years in SHU at Pelican Bay Prison."); ¶ 17 ("I have had an encyclopedia [with its hardcover removed] consisting of over 3,000 pages since 1993, and it has not been damaged in all these years."); Johnson Dec. ¶¶ 8-9, 12 (similar). Inmates explain an uncomplicated process that was in effect for almost a decade that allowed them to receive hardbound books without the covers. See, e.g., Ashker Dec. ¶¶ 3-4, 11-12; Troxell Dec. ¶¶ 4, 7.

Defendant provides no counter-evidence, not even a declaration by a staff member, to dispute the inmates' assertions that it is not more complicated to process hardcover books and that the books, without their covers, do not fall apart, making them more difficult to search. Instead, Defendant states that the hardbound book regulation was closely related to the goal of preserving prison security and cites Mauro. In Mauro, however, the "relationship between the possession of sexually explicit materials and the problems sought to be addressed by the policy -- sexual harassment of female officers, jail security and rehabilitation of inmates -- is clear." 188 F.3d at 1059. Here, no such relationship is clear.

Plaintiffs note that they are not challenging PBSP's policy that requires all hardcover books to come directly from vendors and have their covers removed by staff. They are only challenging PBSP's policy that prevented inmates from having hardbound books, even after the covers were removed, a policy that, since this suit was brought, has been amended. As Defendant acknowledges in his reply, "Perhaps PBSP's new policy permitting modified hardcover

13

books into the prison is the more constitutionally palatable solution."  The Court must conclude that there is no common sense relationship between banning hardcover books without their covers and PBSP's interests in preventing the introduction of contraband or ensuring prison safety.

Although the Court need not consider the remaining factors, it will.  The consideration of those factors makes it even more clear that Defendant's policy impermissibly violated Plaintiffs' First Amendment rights because it is not reasonably related to a legitimate penological interest.

B. Alternative Means

The second factor requires the Court to examine whether Plaintiffs had alternative means of exercising their First Amendment rights.  The Supreme Court instructs, "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'"  Turner, 482 U.S. at 90 (quoting Pell, 417 U.S. at 827) (inner citation omitted; alterations in original).  Defendant notes that Plaintiffs were not barred from receiving all publications and that inmates could receive paperback books.  Because many books are not available in paperback, this factor only slightly supports the no-hardbound-books policy; the remaining two factors, however, do not support the no-hardbound-books policy.

14

### C. Accommodation and Allocation of Prison Resources

The third factor requires the Court to examine the impact that the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. Turner, 482 U.S. at 90. As Plaintiffs note, for many years, inmates were allowed to have hardbound books with the covers removed. Defendant provides no explanation for beginning to enforce the written no-hardbound-books policy. Instead, Defendant contends that prison officials were concerned that inmates would file claims for the damage to hardcover books and that their ban on hardbound books encourages the purchase of softcover books, which are easier to process because they do not have to be modified. As Plaintiffs note, however, inmates have to sign an agreement releasing PBSP and its staff from all liability before the cover is removed. And Defendant's contention that softcover books are easier to process does not address whether the accommodation of permitting hardbound books without the covers will have a significant negative impact on prison guards, other inmates and the allocation of prison resources. Indeed, PBSP's new written policy allowing inmates to have hardcover books without the cover indicates that the accommodation of Plaintiffs' First Amendment rights will not have a significant negative impact. This is especially true considering that allowing inmates to have hardbound books without the covers was the unwritten policy for many years, a fact Defendant ignores, but does not deny.

15

D. Reasonable Alternatives or "Exaggerated Response"

The final factor for the Court to consider is whether the policy is an exaggerated response to the prison's concerns. In <u>Turner</u>, the Supreme Court explained that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." 482 U.S. at 90. Here, Plaintiffs point to an alternative that fully accommodates the prisoners' rights at a <u>de minimis</u> cost to valid penological interests: the policy recently adopted by PBSP that permits hardcover books if their covers have been removed and if inmates sign an agreement absolving PBSP and its staff from liability surrounding the removal of the cover. The new policy is evidence that the total ban on hardcover books does not satisfy the reasonable-relationship standard. <u>Id</u>. at 90-91. Defendant's contention that the "proffered solution" of removing the covers of the book was not easy because it diminishes the durability of the book is not persuasive.

The Court finds that the ban on hardbound books with their covers removed was not reasonably related to legitimate penological interests. But, as Defendant notes, this policy has been revised. Defendant requests that the Court exercise its discretion not to grant Plaintiffs' request for declaratory relief, because of the revised policy. <u>Maryland Cas. Co. v. Knight</u>, 96 F.3d 1284, 1288 (9th Cir. 1996) (district courts possess discretion in determining whether and when to entertain an action under the Declaratory

16

Judgment Act). According to Defendant, in the unlikely event that the policy on hardcover books is again changed, Plaintiffs can challenge that policy by adding the claim to their next suit. The Court denies Defendant's request and grants Plaintiffs their requested declaratory relief: PBSP's prior policy of disallowing hardbound books was unconstitutional.

II. Qualified Immunity

Defendant argues that he is entitled to qualified immunity. The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The threshold question is whether, taken in the light most favorable to the plaintiff, the facts alleged show that the official's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). The plaintiff bears the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct. Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992).

As discussed above, the ban on hardcover books, implemented and enforced by Defendant, violated Plaintiffs' First Amendment rights. Thus, the Court must next determine whether that right was clearly established: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 201-2. To defeat the defendants' claim of qualified immunity, the plaintiff has "to show that the policy was such a far cry from what

17

1  any reasonable prison official could have believed was legal that
2  the defendants knew or should have known they were breaking the
3  law." Sorrels v. McKee, 290 F.3d 965, 971 (9th Cir. 2002). Here,
4  it is reasonable that, even though the Court has found otherwise,
5  Defendant McGrath could have thought that the hardbound book policy
6  would pass muster under Turner. Inmates were still allowed access
7  to millions of paperback books; the no-hardbound-books policy was
8  modified to permit inmates to use educational books with the hard
9  covers removed when Defendant learned that some education programs
10 did not have softcover books available for their correspondence
11 courses.

12      Plaintiffs respond that Defendant is not entitled to qualified
13 immunity because the First Amendment right at issue here was
14 clearly established. According to Plaintiffs, there is a series of
15 cases showing that blanket banning of types of books violates the
16 First Amendment rights of inmates. But in two of the cases
17 Plaintiffs cite, the court found that the defendants were entitled
18 to qualified immunity. See Johnson, 948 F.2d at 520-21 (holding
19 that, in light of pre-existing law, the unlawfulness of denying
20 access to softcover books from other parties is not apparent, and
21 thus the defendants were entitled to prevail on their defense of
22 qualified immunity); Keenan, 83 F.3d at 1093 (noting that qualified
23 immunity protected the defendants from damages liability on the
24 plaintiff's claim challenging the prison's policy under which only
25 publishers may send reading materials to the inmates). Although
26 Bell established that the prohibition against receipt of hardbound
27 books unless mailed directly from publishers, book clubs, or

bookstores does not violate the First Amendment rights of inmates, it did not clearly establish the right to receive hardbound books without the covers in situations where inmates were allowed access to non-hardbound publications.  See Bell, 441 U.S. at 550.

Plaintiffs do not meet their burden of proving the existence of a clearly established right.  Nor do Plaintiffs provide any authority to support their assertion that the alleged retaliation claim precludes any finding that Defendant is entitled to qualified immunity.  The Court finds that Defendant is entitled to summary judgment of qualified immunity from Plaintiff Ashker's damages claim against him.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part Plaintiffs' Motion for Summary Judgment/Partial Summary Judgment or Alternative Motion for Preliminary Injunction (Docket No. 38) and DENIES it in part.  Specifically, the Court determines that summary judgment regarding Plaintiffs' request for declaratory relief is proper: PBSP's prior policy of disallowing hardbound books, even those with the covers removed, was unconstitutional.  The Court, however, will not issue an injunction because PBSP has revised its policy; PBSP no longer prohibits hardcover books with their covers removed.

Defendant's Cross-Motion for Summary Judgment (Docket No. 63) is DENIED in part and GRANTED in part: Defendant McGrath is entitled to qualified immunity.

Judgment shall enter accordingly.  As discussed at the hearing, Plaintiffs' counsel has sixty days to file a motion for

19

attorney's fees.

   IT IS SO ORDERED.


Dated: 3/8/06

_____
CLAUDIA WILKEN
United States District Judge